# EXHIBIT A

**Jonathan I. Dorman, Esq.**
Law Offices of Jonathan I. Dorman, LLC
Three University Plaza
Suite 207
Hackensack, New Jersey 07601
(201) 880-5511 Telephone
Bar ID: NJ 024292005
***Attorney for the Plaintiffs***

| | |
|---|---|
| ADAM DORMAN, an individual, and SOUTH JERSEY MYSTICS, a 501(c)(3) corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>ELYSIAN ONE, a Delaware corporation, JOHN DOES 1-10, and ABC CORPS. 1-10,<br><br>Defendants,<br><br>vs.<br><br>ELYSIAN PARK VENTURES, LLC, and LOS ANGELES DODGERS, LLC, and LOS ANGELES DODGERS HOLDING CORP, LLC, and GUGGENHEIM BASEBALL MANAGEMENT, GP, LLC, and GUGGENHEIM BASEBALL MANAGEMENT, LP,<br><br>Nominal Defendants, | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br>BURLINGTON COUNTY<br><br>DOCKET NO. ___________<br><br>**CIVIL ACTION**<br><br>**COMPLAINT, JURY DEMAND AND DESIGNATION OF TRIAL COUNSEL** |

The Plaintiffs, Adam Dorman and the South Jersey Mystics, by way of complaint against the defendants hereby states:

## THE PARTIES

1. Plaintiff, ADAM DORMAN ("Mr. Dorman"), is an individual residing at 17 New Mills Drive, Borough of Pemberton, County of Burlington, State of New Jersey.

2. Plaintiff, SOUTH JERSEY MYSTICS, INC. (the "Mystics"), is a 501(c)(3) corporation having a business address of 17 New Mills Drive, Borough of Pemberton, County of Burlington, State of New Jersey.

3. Defendant, ELYSIAN ONE, INC. ("EL1") is a Delaware corporation maintaining a physical business located at 5 Mary Way, Unit C, Township of Hainesport, County of Burlington, State of New Jersey (the "Hainesport Facility").

4. Defendants JOHN DOES 1-10 are yet unnamed or unknown individuals.

5. Defendants ABC CORPS. 1-10 are yet unnamed or unknown business entities.

6. Nominal Defendant, ELYSIAN PARK VENTURES, LLC, is a duly registered Delaware limited liability company and an affiliate of EL1 having a principal address of 1000 Vin Scully Avenue, City of Los Angeles, County of Los Angeles, State of California.

7. Nominal Defendant, LOS ANGELES DODGERS, LLC, is a duly registered Delaware limited liability company and an affiliate of EL1 having a principal address of 1000 Vin Scully Avenue, City of Los Angeles, County of Los Angeles, State of California.

8. Nominal Defendant, LOS ANGELES DODGERS HOLDING COMPANY, LLC, is a duly registered Delaware limited liability company and an affiliate of EL1, having a principal address of 1000 Vin Scully Avenue, City of Los Angeles, County of Los Angeles, State of California.

9. Nominal Defendant, GUGGENHEIM BASEBALL MANAGEMENT GP, LLC is a duly registered Delaware limited liability company and an affiliate of EL1, with a registered agent address of 3500 S. Dupont Highway, City of Dover, County of Kent, State of Delaware.

10. Nominal Defendant, GUGGENHEIM BASEBALL MANAGEMENT, LP, is a duly registered Delaware limited liability company and an affiliate of EL1, with a registered agent address of 3500 S. Dupont Highway, City of Dover, County of Kent, State of Delaware.

11. Venue is proper under R. 4:3-2.

## BACKGROUND AND FACTS

12. Adam Dorman is the President of the South Jersey Mystics and a former employee of EL1.

13. The Mystics are a youth softball program currently comprised of 13 different travel softball teams for girls from ages 8-18.

14. EL1 is a for-profit company that (1) provides physical facilities and auxiliary coaching for third-party youth baseball and softball programs, (2) performs administrative and accounting services and other ancillary services to third-party youth baseball and softball programs and (3) operates clinics and other skills-based learning for youth baseball and softball.

**EL1's Acquisition of the Hainesport Facility and the Mystics joining EL1's Powered By Program.**

15. Prior to EL1's acquisition, the Hainesport Facility was leased to and operated in a joint venture, with the Mystics responsible for 50% of the facility's costs and Pro Skills, a youth baseball organization, responsible for the other 50%.

16. In Spring, 2022, the Mystics and Pro Skills were facing an impending rent increase that their respective programs could not afford.

17. Looking to find a solution that would allow the Mystics to continue uninterrupted in the facility, Mr. Dorman spoke with many people about the situation.

18. Through these conversations, in or about early June, 2022, Mr. Dorman was connected with EL1 co-founder Aaron Trolia.

19. Mr. Dorman had several meetings with Aaron Trolia and later with other EL1 employees, including Frank Decembrino.

20. During these meetings, EL1 presented Mr. Dorman and the Mystics with an option whereby EL1 would assume the lease at the Hainesport Facility and the Mystics would be able to use the facility by becoming customers of EL1's "Powered By" program.

21. The "Powered By" program is EL1's suite of services including, but not limited to, use of EL1's facilities, as well as use of EL1's administrative and accounting services, coach and manager development, and support with uniforms and fan gear (henceforth, "Powered By").

22. The hallmark of Powered By's program is the administrative and accounting services, a system whereby EL1 collects all the fees from the parents and then subsequently

disperses those fees according to a budget agreed upon by an EL1 financial analyst and the individual team director.

23. During these meetings, EL1 made numerous assurances and promises to Mr. Dorman about the support the Mystics would receive from EL1 both on and off the field if the Mystics became customers of Powered By, touting Powered By and EL1 as "minimizing stress and confusion from Day One."

24. Specifically, EL1 advertised they their services were comprehensive and that they would handle all the administrative and accounting duties so that Mr. Dorman could focus his efforts on coaching the Mystics.

25. EL1 further represented that both on-the-field and off-the-field services would be provided by a cadre of professionals, and that EL1 was uniquely positioned to support the Mystics and softball, frequently citing its affiliation with Major League Baseball, certain Major League Baseball organizations and certain former Major League Baseball players as evidence that it was a serious operation capable of supporting the Mystics.

26. To sweeten the deal and ensure the Mystics would become Powered By members, EL1 also offered Mr. Dorman the position of Director of Softball for the Hainesport Facility.

27. Mr. Dorman accepted the position with the express understanding that doing so would not impede his ability to (1) focus his efforts on coaching and growing the Mystics, (2) continue to provide softball lessons at the Hainesport Facility and/or (3) run off-site tournaments.

28. Based on these assurances, Mr. Dorman agreed to EL1's assumption of the lease for the Hainesport Facility while simultaneously agreeing to the Mystics joining the EL1 Powered By program and while personally serving as EL1's Softball Director at the Hainesport Facility.

29. The Mystics participation as customers of the Powered By program was documented in a Memorandum of Understanding ("MOU"), drafted wholly by EL1, and signed by parties on or about July 13, 2022.

30. While the EL1 sets forth a loose set of responsibilities required of each party, it contains no provisions detailing fee structure, nor the manner in which the funds entrusted to EL1 by the Mystics would be allocated by EL1, nor does it contain any provisions regarding termination.

31. In fact, the MOU is devoid of any of the details or standard clauses that appear in most contracts, including choice of law, choice of forum, force majeure, limitation,

indemnification or warranties and disclaimers clauses, among others.

32. Nevertheless, desperate to keep the Hainesport Facility as the home of the Mystics, Mr. Dorman informed his Mystics teams that the Mystics would be Powered By customers, effective August 1, 2022, at which time Mr. Dorman began fulfilling his and the Mystics responsibilities as he perceived them under the MOU.

33. The single most important responsibility initially set forth by EL1 was making sure that the Mystics fees were collected and centralized by EL1, effectively giving EL1 complete control over the Mystics revenue and the disbursements.

34. Mr. Dorman ensured that the parents of the Mystics teams using Powered By began making their monthly fee payments directly to EL1, as stressed by EL1.

35. By September, 2022, EL1 retained complete control over the Mystics cash and finances.

**<u>EL1's Breach of the MOU and general inability to provide the promised services.</u>**

36. Almost immediately, EL1 began breaching its obligations to the Mystics under the MOU, and it became increasingly obvious that EL1 was not just incapable of

living up to the promises it had made in enticing the Mystics to become Powered By customers, but had misrepresented, both affirmatively and by omission, EL1 as a brand, as well as its services and ability to provide those services.

37. With all of the Mystics funds now in the hands of EL1, Mr. Dorman was anxious to meet with the financial advisor assigned by EL1 to review and monitor the team budgets so that the Mystics would not be adversely affected.

38. Despite numerous and frequent attempts to meet with the EL1 financial advisor initially assigned to the Mystics, that financial advisor refused to meet with Mr. Dorman for a period of several months, from approximately August, 2022 until mid-November, 2023, with the financial advisor constantly canceling appointments or otherwise finding excuses not to meet.

39. With the exception of an introductory video call, Mr. Dorman never met with the initial financial advisor and it was not until EL1 assigned a new financial advisor that there was a meeting, at this point well into the season and several months after the Mystics initially became Powered By customers.

40. By this time there were already several disputes over the allocation of funds and the Mystics budgets.

41. Further, shortly after joining EL1 as an employee, in or around mid-August, 2022, EL1 held a team-building event and leadership conference in Seattle, Washington for certain EL1 employees, including Mr. Dorman (the "Leadership Conference").

42. During one meeting at the Leadership Conference, EL1's Chief Financial Officer, Greg Wittreich, announced to the employees that EL1 had not properly accounted for umpire fees the previous season, and that as a result they were in a precarious financial position whereby they were prioritizing salaries to the exclusion of other accounts payable.

43. In that same announcement, Mr. Wittreich further stated that the company was taking measures to ensure that the company did not ever face the same circumstances again, including finding partners and investors.

44. While Mr. Dorman knew enough about the softball business to understand the position EL1 was in, he was concerned because EL1 had failed to indicate that they were in financial dire straits in the previous two months when EL1 was pitching the Mystics on Powered Up and the MOU was negotiated.

45. Mr. Dorman was further concerned about EL1's ability to provide the services promised to the Mystics upon

learning that EL1 was struggling to meet any other bills outside of payroll.

46. Unfortunately, Mr. Dorman's concerns proved correct as EL1 began materially breaching the MOU shortly thereafter.

47. Although EL1 was now the lessee of the Hainesport Facility, the Mystics continued using the Hainesport Facility in the same capacity as they had prior to EL1's assumption of the lease from on or about August 1, 2022 until on or about September 12, 2022.

48. That usage continued until on or about September 12, 2022, at which time EL1 was unable to provide access to the Hainesport Facility because it was undergoing a renovation.

49. The renovation was initially described to Mr. Dorman as going to take place over the last two weeks of September, 2022.

50. However, due to EL1's negligence and lack of funds to properly and expeditiously complete the renovation, the two-week period turned into a six-week period.

51. During the period of time that the Mystics were unable to use the facility, EL1 offered little to no support to the program.

52. Without a home, the Mystics were only able to continue practicing during this time period because of the efforts of Mr. Dorman, who

a. (1) made part-time use of the Westampton Sports Complex, an outdoor facility that the Mystics had consistently rented for a decade to supplement their indoor practices; and

b. (2) found a parent of a current Mystics player willing to donate the use of three fields located at 666 Packer Avenue, Philadelphia, PA (the "Packer Fields").

53. The Packer Fields were less than ideal for the Mystics.

54. However, with EL1 providing no meaningful support to the Mystics at that moment and continually mispresenting the dates by which the Hainesport Facility renovation would be finished, the Packer Fields were the best option as they offered the Mystics nearly unfettered access to a facility with lights.

55. During this period of time, Mr. Dorman was inundated with complaints from the parents of Mystics players about the lack of an indoor and/or more central facility and the perceived lack of support from Mr. Dorman and EL1.

56. Despite EL1 having promised Mr. Dorman he would be spending more time with his teams, the single most important selling point in enticing the Mystics to become customers of Powered By, the opposite was happening.

57. Mr. Dorman was spread so thin by having to compensate for EL1's failure to provide services that his ability to focus on coaching the Mystics was severely diminished.

58. This led to the perception among some Mystics parents that the reason the Mystics were not receiving an adequate level of support was because Mr. Dorman had "sold out" to EL1, and no longer cared about the Mystics program.

59. In fact, Mr. Dorman was fighting EL1 'tooth and nail' to ensure that the Mystics program remained viable during the time EL1 refused access to the Hainesport Facility, despite EL1 being the company contracted with the Mystics to provide the services and support to help the program succeed.

60. The use of the Packer Fields, solely arranged by Mr. Dorman, salvaged the Mystics Fall, 2022 season.

61. The use of the Packer Fields came at no cost to the Mystics and Mr. Dorman neither asked for nor received any payment from EL1 for the use of the Packer Fields.

62. Further, while lighted fields normally incur an additional expense to the teams for electricity, the Mystics never so much as received an invoice from the parents who provided access to the fields. Upon information and belief, the parents covered the power expense of several thousand dollars themselves.

63. As a gesture of good will, and to try and offer some measure of compensation to the parents when EL1 would not, Mr. Dorman informed the parents that their daughter's fees would be waived for that coming year.

64. Given that EL1 had made no accommodations for the Mystics during the time the Mystics were unable to use the Hainesport Facility, and that the Packer Fields did not cost EL1 anything, Mr. Dorman approached EL1 and explained the offer to the parent with the hope that EL1 would understand the situation and adjust the team budget to accommodate the offer.

65. Instead, citing the MOU, EL1 stated that the full $4,500 was the responsibility of the Mystics, created an immediate $4,500 debt from the Mystics to EL1, which it then satisfied by unilaterally debiting that particular Mystics' team's budget.

66. The Mystics were further required to work with the "education arm" of EL1.

67. As part of this education, EL1 would watch and evaluate Mystics practices, providing guidance and feedback as to how to improve.

68. To fulfill this requirement, EL1 had employees Kevin Miller (EL1 Quality Assurance Manager) and Eric Eagon (Director of Education and Training Operations) watch a video-taped Mystics practice.

69. After watching the practice, on or about January 17, 2023, Mssrs. Miller and Eagon met with most Mystics coaches to offer feedback.

70. While it was believed that EL1 was providing professionals who could evaluate softball, Mssrs. Miller and Eagon opened the meeting with the Mystics staff by confessing that, being baseball specialists, they were unaware of the rules in softball and asked that the Mystics coaches provide them explanations of basic rule differences between baseball and softball.

71. The immediate and open consensus among the Mystics coaches following the meeting with Mssrs. Miller and Eagon was in line with what Mr. Dorman had already concluded--that EL1 was "a joke," unwilling and unable to adequately support

softball, and focused almost exclusively on its youth baseball business.

**EL1's attempts to create profitability at the expense of the Mystics, Mr. Dorman's termination and the Mystics departure from Powered By.**

72. Having missed its projections the previous year and unable to generate enough revenue to satisfy its Board of Directors, investors, potential investors and partners, including at least one Major League Baseball (MLB) organization, EL1 was desperate to find ways to artificially inflate its assets, while decreasing its expenses.

73. EL1 efforts to achieve profitability came at the expense of the Mystics, which EL1 viewed as less as a team and more as a cash register.

74. As Powered By customers, the Mystics accounted for more than 60% of the revenue earned by the Hainesport Facility.

75. In fact, in 2022, EL1 cited the Mystics as the most successful new Powered By organization in the entire country, distancing their nearest competitor by more than 50%.

76. Rather than support their newest and most profitable organization, EL1 saw fit to do everything possible to rape the organization of fees in an attempt to

achieve profitability and make itself appear more attractive to prospective investors.

77. One such scheme involved the $2,000 per player fee EL1 was to receive from the Mystics for use of the Powered By program.

78. Rather than recognize the management fees as earned each month, EL1 accounted for the entire $2,000 management fee immediately.

79. This had the effect of creating an immediate financial and accounting 'black hole' for the Mystics from which it would be impossible to crawl out unless the Mystics stayed customers of Powered By.

80. During the time EL1 was inappropriately engorging itself and fattening its bottom line with front-loaded fees in an effort to appear more attractive to investors, it failed to provide a credit to the Mystics, or account in any way, for the period of time during which the Mystics were unable to use the Hainesport Facility and during which EL1 provided no program support.

81. In addition to these two accounting schemes, EL1 devised a plan to eliminate Mr. Dorman's salary from EL1's books, while simultaneously keeping the Mystics as Powered By customers to earn their $2,000 per player fee.

82. On many occasions, Mr. Dorman expressed his dissatisfaction with EL1 because of the lack of support EL1 was providing him and his program. Some examples of problems with which Mr. Dorman took issue include, but are not limited to:

a. EL1's failure to provide the Mystics with access to the Hainesport Facility and continued misrepresentations about the renovation of the Facility;

b. The fact that EL1 failed to provide meaningful support during the period of time that the Mystics were unable to use the Hainesport Facility;

c. The fact that EL1 had reneged on its promise to allow Mystics alumni to use the facility free of charge during holiday breaks, a long-standing policy of the Mystics and one which had EL1 promised would be carried over;

d. EL1's accounting practices and treatment of the Mystics in light of the fact that the Mystics were a top producing organization for EL1;

e. EL1's clear misrepresentations about its interest in providing an equal amount of support to softball as it did baseball;

f. EL1's last-minute failure to abide by an oral agreement to allow Mr. Dorman to use the Hainesport Facility for a clinic, forcing Mr. Dorman to incur additional expense to rent a different facility to host the clinic.

83. Rather than attempt to rectify the situation by honoring its agreements with the Mystics and Mr. Dorman, or by providing further support to Mr. Dorman, EL1 construed Mr. Dorman's understandable frustration, honest complaints and feedback as his not being a "team player."

84. Mr. Dorman's legitimate complaints about EL1's failure to meet its obligations were instead deemed as disrespectful and rude, and Mr. Dorman received a "final warning letter" from EL1.

85. With the knowledge that they were about to terminate Mr. Dorman to eliminate his salary from their books, on or about March 6, 2023, EL1 coerced Mr. Dorman into personally signing a bare-bones Promissory Note for $25,000.00 (twenty-five thousand dollars) related to purported Mystics debt that had previously been negotiated by the parties.

86. The Promissory Note attempted to lock the Mystics into the Powered By program until August, 2024 by holding an otherwise negotiated debt further over Mr. Dorman's head.

87. The Promissory Note stated that the debt would be due in August, 2024, provided the Mystics remained Powered By customers.

88. However, if the Mystics left Powered By, the $25,000 would become due immediately, with Mr. Dorman personally liable, as opposed to the Mystics organization, the proper debtor.

89. The bare bones Promissory Note sought to intimidate Mr. Dorman into continuing to use Powered By, thereby ensuring the continued generation of lucrative fees for EL1, in exchange for which they added little to no value to the Mystics.

90. The Promissory Note also had the ancillary benefit of creating a receivable asset for EL1, the existence of which improved EL1's accounting bottom line and making it look more attractive to potential investors and partners.

91. Two days after Mr. Dorman signed the Promissory Note, on or about March 8, 2023, EL1 terminated Mr. Dorman's employment.

92. With his employment having been terminated and with it crystal clear that the Mystics were viewed only in terms of how much money they generated, Mr. Dorman made the decision to remove the Mystics from EL1's Powered By program, effective April 1, 2023.

93. Mr. Dorman was aware that by pulling the Mystics from Powered By, he was incurring a substantial debt. Nevertheless, given how poorly EL1 treated the Mystics and EL1's lack of support or understanding of youth softball, he believed it was the only way to save his program in the long-run.

94. The termination by the Mystics was proper and permissible, as no agreement exists forbidding the Mystics from terminating nor are there clauses otherwise governing renewals or a continued relationship between the Mystics and EL1.

**EL1's subsequent attempts to discredit Mr. Dorman and decimate the Mystics.**

95. Not content to let the Mystics and their windfall of fees simply walk away, EL1 felt the need to continue to rape the Mystics for fees.

96. On or about April 7, 2023, the CFO of EL1, Greg Wittreich, sent an email to the parents of every single Powered By Mystics team.

97. The emails attempted to smear and embarrass Mr. Dorman by attaching an email from EL1 CEO, bringing to light the existence of the $25,000 debt.

98. The emails further stated that, as a result of withdrawing as Powered By customers, each Mystics team had incurred a debt payable to EL1.

99. These emails provided budget numbers for each team, with EL1 indicating that it was completely transparent in its accounting.

100. However, these emails and alleged supporting budgets failed to mention that it was only because EL1 had taken the full $2,000 management fee in advance, as opposed to as earned, that debts existed.

101. In fact, had EL1 properly accounted for fees related to the services it provided, the Mystics estimate that each program would have been entitled to a refund of approximately $667.00 per player as of the time of termination.

102. With 158 registered Powered By players, the Mystics were due a refund of approximately $105,000.00 at the time they were no longer a Powered By customer.

103. EL1 further indicated in the April 7 emails that, unless the individual teams settled the fictitious amounts due by April 15, 2023, EL1 would begin the process of withdrawing the Mystics teams from tournaments in which they are scheduled to play in order to recoup funds that EL1 says are due as a result of EL1's breach of its fiduciary duty.

104. No Mystics team has settled the debt with EL1.

**COUNT I**
**BREACH OF CONTRACT**

105. Plaintiffs repeat and incorporate paragraphs 1 through 104 above as if fully set forth herein.

106. The parties had an agreement whereby the Mystics would join EL1's Powered By program in exchange for EL1 providing certain services to the Mystics.

107. The Mystics performed as required under the agreement.

108. EL1's breaches of the agreement include, but are not limited to:

a. Failing to provide access to the Hainesport Facility;

b. Failing to provide services set forth in the agreement between the parties;

c. Failing to properly account for Mystics funds entrusted to EL1;

d. Failing to timely provide a financial analyst to review Mystics budgets; and

e. Failing to provide adequately-trained softball instructing staff as required in the agreement between the parties.

109. As a result of Defendants' breaches, Plaintiffs have suffered damages.

WHEREFORE, the Plaintiff prays for judgment against the Defendants for the following relief, and such other relief as the Court may deem proper:

a. Compensatory damages in an amount to be determined at trial;

b. Punitive damages;

c. Interest;

d. Attorney's fees; and

e. Costs of suit.

## COUNT II
## BREACH OF THE DUTIES OF GOOD FAITH AND FAIR DEALING

110. Plaintiffs repeat and incorporate paragraphs 1 through 109 above as if fully set forth herein.

111. The covenant of good faith and fair dealing was inherent in the MOU entered into by the parties.

112. Plaintiffs had the right to honesty in fact and the observance of reasonable commercial standards of practice in the trade when dealing with EL1.

113. Through its conduct, misrepresentations, omissions of fact, improper and egregious accounting practices and breach of its other contractual duties, EL1's actions had the effect of destroying or injuring Plaintiffs' right to receive the full fruits of the agreement between the parties.

114. As a result of EL1's breach of the duties of good faith and fair dealing, Plaintiffs have been damaged.

WHEREFORE, the Plaintiff prays for judgment against the Defendants for the following relief, and such other relief as the Court may deem proper:

a. Compensatory damages in an amount to be determined at trial;

b. Punitive damages;

c. Interest;

d. Attorney's fees;

e. Costs of suit; and

f. Any other relief the Court deems reasonable and just.

**COUNT III**
**BREACH OF FIDCUIARY DUTY**

115. Plaintiffs repeat and incorporate paragraphs 1 through 114 above as if fully set forth herein.

116. EL1 collected the funds due from the individual Mystics players and the Mystics entrusted those funds to EL1.

117. In return, EL1 had a fiduciary duty to manage those funds in a manner consistent with the agreement between the parties.

118. Rather than properly safeguard those funds and allocate them in a manner that ensured the financial success of the Mystics as was EL1's fiduciary duty, EL1 immediately engorged itself by directing Mystics money to itself for the entirety of its management fee, despite that fee not being fully earned, rendering the Mystics teams immediately financially insolvent.

119. EL1 further breached its fiduciary duty by failing to pay for tournaments in accordance with the agreement and understanding between the parties.

120. As a result of EL1's breach of the fiduciary duty, the Mystics have been damaged.

WHEREFORE, the Plaintiff prays for judgment against the Defendants for the following relief, and such other relief as the Court may deem proper:

a. Compensatory damages in an amount to be determined at trial;

b. Punitive damages;

c. Interest;

d. Attorney's fees;

e. Costs of suit; and

f. Any other relief the Court deems reasonable and just.

**COUNT IV**
**NEGLIGENT MISREPRESENTATION**

121. Plaintiffs repeat and incorporate paragraphs 1 through 120 above as if fully set forth herein.

122. As detailed above, EL1 made multiple misrepresentations regarding its ability to provide Powered By services.

123. Plaintiffs relied on those representations in agreeing to join the Powered By program.

124. As a result of Plaintiffs' reasonable reliance, Plaintiffs were damaged.

WHEREFORE, the Plaintiff prays for judgment against the Defendants for the following relief, and such other relief as the Court may deem proper:

a. Compensatory damages in an amount to be determined at trial;

b. Punitive damages;

c. Interest;

d. Attorney's fees; and

e. Costs of suit; and

f. Any other relief the Court deems reasonable and just.

**COUNT V**

**INTENTIONAL MISREPRESENTATION**

125. Plaintiffs repeat and incorporate paragraphs 1 through 124 above as if fully set forth herein.

126. EL1 intentionally misrepresented its financial position and ability to provide services in an effort to induce the Mystics to become customers of Powered By.

127. These misrepresentations include, but are not limited to:

a. EL1's knowing false statements regarding the renovation of the Hainesport Facilty;

b. EL1's knowing false statements about the training and qualifications of its staff in providing the support necessary for the Mystics;

c. EL1's knowing false statements about Mr. Dorman's ability to focus on his programs and run off-site tournaments;

d. EL1's knowing false statements about its ability to provide the services required of it pursuant to the Agreement between the parties.

128. Plaintiffs justifiably relied on the knowing false statements made by EL1.

129. As a result of EL1's intentional misrepresentations, Plaintiffs have suffered damages.

WHEREFORE, the Plaintiff prays for judgment against the Defendants for the following relief, and such other relief as the Court may deem proper:

a. Compensatory damages in an amount to be determined at trial;

b. Punitive damages;

c. Interest;

d. Attorney's fees; and

e. Costs of suit; and

f. Any other relief the Court deems reasonable and just.

**COUNT VI**

**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**

130. Plaintiffs repeat and incorporate paragraphs 1 through 129 above as if fully set forth herein.

131. At all times relevant to this Complaint, Plaintiffs maintained a contractual obligation and were continuing to pursue their business of providing youth softball services to the players of each of the teams owned and operated by the Mystics.

132. This relationship conferred an expectation of economic benefit to the Plaintiffs, who have a history of charging and collecting fees for the services provided to the members of the Mystics softball teams, which fees are allocated to ensure that the Mystics softball program is properly run.

133. On or about April 7, 2023, Greg Weittreich ("Weittreich"), EL1's Chief Financial Officer ("CFO") intentionally and with malice aforethought, emailed the

entire parent roster of every individual team separately (the "Weittreich Emails").

134. The Weittreich emails intentionally provided false information to the families of the Mystics players, namely that each team was currently indebted to EL1 by an amount specific to that team.

135. The Weittreich emails further threatened to withdraw the individual Mystics teams from future tournaments in which they are entered so that EL1 could recoup its factitious debt, created by EL1 through its improper accounting practices.

136. Although it was known to Weittreich at the time that the Mystics team/program was under the control of Mr. Dorman, who was not copied on the emails and is simply referred to in the emails as the "Mystics Director", Weittreich instead suggests the teams subvert Mr. Dorman's authority as the Mystics Director and requests that a "team representative" contact EL1 regarding the debt "before the close of business on 4/15/23."

137. The Weittreich Emails further attach an email from EL1 CEO Griff Long, in which Long details the initially undocumented and currently disputed $25,000 loan as a result of a "debt from the previous season."

138. The Weittreich Emails weaponize this Promissory Note by stating that the parents should ask for an accounting of the Mystics and suggesting a lack of transparency on the part of the Plaintiffs.

139. The emails state that "EL1 has and will continue to put families first," yet failed to state that the alleged debt of each team was the result of EL1 putting itself first by improperly taking its management fee for each player immediately as opposed to on an accrual basis, creating the very condition cited in the emails used to attempt to lure business away from the Mystics.

140. As a result of the Weittreich emails, the Mystics have suffered damage.

WHEREFORE, the Plaintiff prays for judgment against the Defendants for the following relief, and such other relief as the Court may deem proper:

a. Compensatory damages in an amount to be determined at trial;

b. Punitive damages;

c. Interest;

d. Attorney's fees; and

e. Costs of suit; and

f. All other relief the court deems reasonable and just.

**COUNT VII**

**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT, N.J.S.A. 56:8-2, et. seq.**

141. Plaintiffs repeat and incorporate paragraphs 1 through 140 above as if fully set forth herein.

142. In marketing and selling its Powered By services to the Plaintiffs, EL1 committed several unconscionable commercial practices under the New Jersey Consumer Fraud Act ("CFA") with its lack of good faith, honesty in fact and observance of fair dealing.

143. EL1 actively deceived Plaintiffs, made false promises and misrepresentations, and knowing suppressed, omitted and concealed several material facts including, but not limited to:

a. Concealed and misrepresented its financial position and how that financial position would negatively affect EL1's ability to provide the promised services;

b. Concealing from Plaintiffs that EL1 would be taking its fees 'off the top,' as opposed to when earned, thereby creating a deficit that would result in EL1

being unable to pay for expenditures as they came due, such as Mystics tournament fees;

c. Omitting the fact that the Mystics would not be able to use the Hainesport Facility and that EL1 would not provide an alternative nor provide an accounting credit;

d. Misrepresented, and continues to misrepresent, that the Mystics owe money to EL1 in an effort to extort further fees from the Mystics.

144. The Plaintiffs have incurred a debt as a result of EL1's unconscionable commercial practices, and is therefore damaged.

145. Plaintiffs have further sustained an ascertainable loss as a result of EL1's violations of the CFA.

WHEREFORE, the Plaintiff prays for judgment against the Defendants for the following relief, and such other relief as the Court may deem proper:

a. Compensatory damages in an amount to be determined at trial;

b. Treble damages;

c. Interest;

d. Attorney's fees;

e. Costs of suit; and

f. All other relief the court deems reasonable and just.

**COUNT VIII**

**ADDITIONAL AND/OR ALTERNATIVE CAUSES OF ACTION**

146. Plaintiffs repeat and incorporate paragraphs 1 through 145 above as if fully set forth herein.

147. Plaintiff reserves the right to amend her pleadings or bring additional causes of action as the same is disclosed by Plaintiff's continued investigation and/or discovery

LAW OFFICES OF JONATHAN I. DORMAN, LLC
Attorney for the Plaintiffs

By: ______________________
JONATHAN I. DORMAN, ESQ.

Dated: April 10, 2023

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury as to all issues.

______________________
JONATHAN I. DORMAN, ESQ.

Dated: April 10, 2023

**DESIGNATION OF TRIAL COUNSEL**

Jonathan I. Dorman, Esq. is designated trial counsel in this matter.

JONATHAN I. DORMAN, ESQ.

Dated: April 10, 2023

**CERTIFICATION PURSUANT TO R. 4:5-1**

I certify to the best of my knowledge that the matters in controversy in this action are not the subject of any other action pending in any other court or of a pending arbitration proceeding, and that no other action or arbitration proceeding is contemplated.

JONATHAN I. DORMAN, ESQ.

Dated: April 10, 2023

# Civil Case Information Statement

## Case Details: BURLINGTON | Civil Part Docket# L-000712-23

**Case Caption:** SOUTH JERSEY MYSTICS , INC. VS ELYSIAN ONE, INC
**Case Initiation Date:** 04/10/2023
**Attorney Name:** JONATHAN ISAAC DORMAN
**Firm Name:** JONATHAN I. DORMAN, LLC
**Address:** THREE UNIVERSITY PLZ STE 207 HACKENSACK NJ 07601
**Phone:** 2018805511
**Name of Party:** PLAINTIFF : South Jersey Mystics, Inc.
**Name of Defendant's Primary Insurance Company** (if known): None

**Case Type:** CONTRACT/COMMERCIAL TRANSACTION
**Document Type:** Complaint with Jury Demand
**Jury Demand:** YES - 12 JURORS
**Is this a professional malpractice case?** NO
**Related cases pending:** NO
**If yes, list docket numbers:**
**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** YES
**Does this case involve claims related to COVID-19? NO**

**Are sexual abuse claims alleged by: South Jersey Mystics, Inc.? NO**

**Are sexual abuse claims alleged by: Adam Dorman? NO**

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** YES

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
**If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO **Title 59?** NO **Consumer Fraud?** YES

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

04/10/2023
Dated

/s/ JONATHAN ISAAC DORMAN
Signed

BURLINGTON COUNTY
SUPERIOR COURT
49 RANCOCAS ROAD
MT HOLLY NJ 08060

TRACK ASSIGNMENT NOTICE

COURT TELEPHONE NO. (609) 288-9500
COURT HOURS 8:30 AM - 4:30 PM

DATE: APRIL 10, 2023
RE: SOUTH JERSEY MYSTICS , INC. VS ELYSIAN ONE, INC
DOCKET: BUR L -000712 23

THE ABOVE CASE HAS BEEN ASSIGNED TO: TRACK 2.

DISCOVERY IS 300 DAYS AND RUNS FROM THE FIRST ANSWER OR 90 DAYS FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.

THE PRETRIAL JUDGE ASSIGNED IS: HON JAMES J. FERRELLI

IF YOU HAVE ANY QUESTIONS, CONTACT TEAM 003 AT: (609) 288-9500.

IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.

PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE WITH R.4:5A-2.

ATTENTION:

ATT: JONATHAN I. DORMAN
JONATHAN I. DORMAN, LLC
THREE UNIVERSITY PLZ
STE 207
HACKENSACK NJ 07601

ECOURTS

**Jonathan I. Dorman, Esq.**
Law Offices of Jonathan I. Dorman, LLC
Three University Plaza
Suite 207
Hackensack, New Jersey 07601
(201) 880-5511 Telephone
Bar ID: NJ 024292005
***Attorney for the Plaintiffs***

| | |
|---|---|
| ADAM DORMAN, an individual, and SOUTH JERSEY MYSTICS, a 501(c)(3) corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>ELYSIAN ONE, a Delaware corporation, JOHN DOES 1-10, and ABC CORPS. 1-10,<br><br>Defendants,<br><br>vs.<br><br>ELYSIAN PARK VENTURES, LLC, and LOS ANGELES DODGERS, LLC, and LOS ANGELES DODGERS HOLDING CORP, LLC, and GUGGENHEIM BASEBALL MANAGEMENT, GP, LLC, and GUGGENHEIM BASEBALL MANAGEMENT, LP,<br><br>Nominal Defendants, | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br>BURLINGTON COUNTY<br><br>DOCKET NO. **BUR-L-000712-23**<br><br>**CIVIL ACTION**<br><br>**CERTIFICATION OF SERVICE (ELYSIAN ONE, INC.)** |

I, JONATHAN DORMAN, being of full age, do hereby certify as follows:

1. I am a member of the Law Offices of Jonathan I. Dorman, LLC and the attorney responsible for this matter on behalf of the plaintiffs.

2. On April 10, 2023, at approximately 4 p.m., I entered the physical location operated by EL1 and having an address of 5 Mary Way, Unit C, Township of Hainesport, County of Burlington, State of New Jersey.

3. I was greeted by an individual giving an instructive lesson and I immediately asked for Lex Massa, who I believed to be the General Manager of the Hainesport Facility.

4. The individual told me that Lex Massa was in Washington D.C. and then asked if he could be of help.

5. I asked the individual for his name and he responded that his name was "Ed Mitchell."

6. I asked Mr. Mitchell if he was an employee of EL1, and he answered that he was.

7. Mr. Mitchell presented as a Caucasian male, having an approximate height of 5'9-6'1 and an approximate weight between 190-210 lbs., and was wearing an EL1 branded shirt.

8. I then specifically asked Mr. Mitchell whether he was "an individual authorized to accept service of a lawsuit on behalf of EL1?"

9. Mr. Mitchell stated "yes," meaning he was an individual authorized to accept service of a lawsuit on behalf of EL1.

10. Upon Mr. Mitchell indicating that he was an individual authorized to accept service, I personally handed Mr. Mitchell the following documents:

(1) Complaint, Jury Demand and Designation of Trial Counsel; and

(2) Civil Case Information Statement; and

(3) Summons.

11. I then asked Mr. Mitchell for his job title, to which he responded "Program Director."

12. I thanked Mr. Mitchell and left without any further interaction.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

JONATHAN I. DORMAN, ESQ.

Dated: May 8, 2023